FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

2020 JUL 13 PM 1: 53

OFFICE OF THE CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>HIDDEN HILLS OUTFITTERS LLC,<br><br>Defendant. | 8:20CR 87<br><br>PLEA AGREEMENT |

IT IS HEREBY AGREED between the plaintiff, United States of America, through its counsel, Joseph P. Kelly, United States Attorney, and Donald J. Kleine, Assistant United States Attorney, and defendant, HIDDEN HILLS OUTFITTERS LLC, and Paul J. Bruno, counsel for defendant, as follows:

I

## THE PLEA

A.  CHARGE(S) & FORFEITURE ALLEGATION(S).

Defendant agrees to waive Indictment and plead guilty to an Information charging Conspiracy to violate the Lacey Act and Migratory Bird Act, a violation of Title 18, United States Code, Section 371.

Defendant further admits to the Forfeiture Allegation of the Information and agree to the forfeiture of certain property pursuant to Title 16, United States Code, Section 3374 and Title 28 United States Code, Section 2461.

B.  In exchange for the defendant's plea of guilty as indicated above, the United States agrees as follows:

1.  The United States agrees that the defendant will not be federally prosecuted in the District of Nebraska for any other criminal violations based on the conduct alleged in the factual basis set forth in section II of this agreement, the proposed Information, or any other potential Lacey Act violations known to the government as of the date of the signing of this agreement other than as set forth in paragraph A, above. This agreement not to prosecute the defendant for specific crimes does not prevent any prosecuting authority from prosecuting the defendant for any other crime, or for any crime involving physical injury or death.

1

## II
## NATURE OF THE OFFENSE

A. ELEMENTS EXPLAINED.

Defendant understands that the offense to which defendant is pleading guilty has the following elements:

1. That two or more persons reached an agreement or came to an understanding to violate the Lacey Act;
2. That defendant was a party to or member of that agreement or understanding;
3. That defendant knew the purposes of the agreement or understanding; and
4. That while the agreement or understanding was in effect, at least one of its members performed an overt act in order to further the objective of the agreement.

B. ELEMENTS UNDERSTOOD AND ADMITTED - FACTUAL BASIS.

Defendant has fully discussed the facts of this case with defense counsel. Defendant has committed each of the elements of the crime, and admits that there is a factual basis for this guilty plea. The following facts are true and undisputed.

1. That beginning on or before September 15, 2012, and continuing through at least December 31, 2018, J.H. co-owned and acted as the principal operator of a commercial big game hunting and guiding business known as HIDDEN HILLS OUTFITTERS LLC (HHO). HHO is located near Broken Bow, Nebraska, and provided hunting and guiding services to paying clients for white-tailed deer, mule deer, pronghorn, and wild turkey.

2. That during the course of operations between 2012 and 2018, HHO promoted its business and contracted clients primarily through social media websites, electronic mail, mobile telephone and text messages, attendance at out-of-state sports shows, and a sales booth at The Great American Outdoor Show located in Harrisburg, Pennsylvania, all in interstate commerce. HHO contracted hunting clients residing almost exclusively outside the state of Nebraska including at least 118 clients from 21 states outside of Nebraska; that HHO provided guiding and hunting services to contracted hunting clients for $2,500 to $7,000 depending upon the target species; and that HHO assisted and knew clients routinely

purchased, acquired, and transported wildlife trophies, or parts thereof, obtained during the HHO hunts, in interstate commerce.

3. That beginning on or about March 23, 2013, and continuing through at least December 31, 2018, J.H., C.H., N.H., and J.H. were the organizers and initial members of HHO, a domestic limited liability company filed with the Nebraska Secretary of State on May 6, 2013.

4. That between on or about 2013, and continuing through at least November 2017, J.H. and other unindicted co-conspirators, which included other HHO employees and associates, agreed and had an understanding to routinely sell hunting and guiding services to HHO clients for purposes of taking, possessing, and acquiring wildlife in violation of the laws and regulations of the State of Nebraska. It was also part of the agreement and understanding that the wildlife taken, possessed, and acquired in violation of the laws and regulations of the State of Nebraska would be transported in interstate commerce from the State of Nebraska into other states.

5. That as part of the conspiracy, HHO routinely utilized at least the following locations in or near Broken Bow, Nebraska, to provide feeding, lodging, game processing and storage, or other logistical support to hunting clients:

   a. xxxx7 Ryno Road
   b. xxxx2 Callaway Road
   c. xx4 South 7th Avenue

6. That in furtherance of the conspiracy, HHO established leases or other agreements with various landowners and conducted guided hunting operations upon properties in at least Custer, Blaine, Valley, Sherman, Logan, Frontier, Keith, and Morrill Counties, Nebraska.

7. That in furtherance of the conspiracy, J.H. developed, utilized, and marketed a deer feed or supplement under the tradenames "PrimeTine" and "Hard Rack Candy," and that J.H. was an organizer and initial member of PrimeTine LLC and Hard Rack Candy LLC, both domestic limited liability companies filed with the Nebraska Secretary of State on July 10, 2017, and April 9, 2013, respectively.

8. That in furtherance of the conspiracy, J.H., assisted by other unindicted co-conspirators, which included other HHO employees and associates, established and maintained a large network of hunting sites throughout the leased hunting properties consisting of tree stands, ground blinds, or elevated blinds, and that J.H., assisted by other unindicted co-conspirators, which included other HHO employees and associates, routinely established and maintained bait sites over watched monitored by electronic game cameras at no less than 68 baited hunting locations.

9. That in furtherance of the conspiracy, J.H., assisted by other unindicted co-conspirators, which included other HHO employees and associates, maintained and utilized the large network of baited sites monitored by electronic game cameras during and outside the Nebraska deer season in order to locate and identify both target and non-target deer, maximize the hunting client success rate, or kill a specific trophy deer for a specific client.

10. That in furtherance of the conspiracy, from February 26, 2013, through November 3, 2017, J.H., assisted by other unindicted co-conspirators, which included other HHO employees and associates, purchased or acquired at least 115,378 pounds of deer bait products or components, and that during the 2017 Nebraska deer season alone, J.H. purchased no less than approximately 33,000 pounds of PrimeTine, Hard Rack Candy, and cracked corn, and that J.H., assisted by other unindicted co-conspirators, which included other HHO employees and associates, distributed those products at HHO bait sites, including numerous bait sites in close proximity and within plain view of HHO hunting clients.

11. That in furtherance of the conspiracy, J.H., assisted by other unindicted co-conspirators, which included other HHO employees and associates, routinely and intentionally established and maintained bait sites at or near client hunting locations, knowing the bait sites were unlawfully established, in violation of Nebraska State law and regulations, for the purpose of taking big game or turkey, that HHO clients would unlawfully hunt or take big game or turkeys within the baited areas as prohibited by Nebraska Revised Statute (Neb. Rev. Stat.) 37-314 and Nebraska Administrative Code (NAC) Title 163 Section 4.001.01B9 and

defined as an area within 200 yards of any location where bait is placed or maintained for the purpose of hunting and that may serve as an attractant to big game or turkey, and that clients did in fact regularly unlawfully hunt and take deer or turkey within the baited areas, from which wildlife, or parts thereof, was subsequently transported in interstate commerce.

12. That in furtherance of the conspiracy, between 2012 and 2017, J.H., assisted by other unindicted co-conspirators, which included other HHO employees and associates, were aware that HHO archery white-tailed deer clients hunted within a baited area during their hunts, that approximately 80 percent of the archery white-tailed deer clients killed their deer within a baited area, that approximately one-half of HHO rifle white-tailed deer hunting clients hunted and killed their deer within a baited area, and that antlers, hides, edible meat, or other portions of the unlawfully taken wildlife was subsequently transported in interstate commerce.

13. That in furtherance of the conspiracy, between September, 2015, and November, 2017, HHO clients, at the direction or with the guidance and assistance of J.H. and other unindicted co-conspirators, which included other HHO employees and associates, unlawfully took white-tailed deer or mule deer within a baited area as defined and prohibited by NAC Title 163 Section 4.001.01B9, that the hunting clients routinely hunted in direct site of and within less than 50 yards of the bait site, and that no less than 16 white-tailed deer, mule deer, or parts thereof, taken unlawfully within baited areas were subsequently transported in interstate commerce.

14. That in furtherance of the conspiracy, J.H. and other unindicted co-conspirators, which included other HHO employees and associates, were members of a "Gun Trust" established by Wisconsin associate D.M., and that during the course of HHO hunts between 2012 and 2017, J.H. and other unindicted co-conspirators utilized a Howa Model 1500 .223 caliber bolt-action rifle with attached Mack Brothers suppressor, a Savage M-25 .17 caliber Hornet bolt-action rifle with attached SilencerCo suppressor, a Hogan Model H223 Multi-caliber semi-automatic rifle with .223 caliber upper receiver with attached Mack Brothers suppressor, a DPMS Panther Arms Model LR-308 semi-automatic rifle with

attached suppressor, a custom-made .300 caliber bolt-action rifle with attached SilencerCo suppressor, and other firearms for unlawfully taking at least 47 white-tailed deer, mule deer, pronghorn, or wild turkeys from the roadway, during night-time closed season hunting hours with the aid of artificial light, or under the authority of permits prohibiting the use of a firearm in violation of Neb. Rev. Stat. 37-513(1), 37-514(1), 37-447, 37-314, and NAC Title 163 Sections 4.003.01B and 4.003.01C. HHO associates routinely utilized rifles equipped with suppressors in order to reduce the audible sound of the shots and conceal the unlawful use of the firearms from other persons or hunters who could have potentially reported the violations. J.H. and other HHO associates subsequently assisted and knew wildlife, or parts thereof, originating from these unlawful hunts was transported in interstate commerce.

15. That in furtherance of the conspiracy, from at least 2014 through 2016, J.H. and other unindicted co-conspirators, which included other HHO employees and associates, provided guiding and outfitting services for mule deer during the Firearm and Muzzleloader deer seasons to clients within the Mule Deer Conservation Area (MDCA), a geographic area established by the Nebraska Game and Parks Commission (NGPC) for the purpose of providing additional mule deer conservation control measures, and requiring specified hunting permits in order to lawfully hunt or take mule deer within those zones; that J.H. aided, directed, or otherwise assisted HHO clients or guides taking at least eight (8) mule deer within the MDCA knowing the clients and guides did not possess a valid permit to hunt mule deer within the MDCA; and furthermore, J.H. attempted to conceal the violations by assisting the clients to purchase or obtain a valid permit after the kill or by falsifying information reported to the NGPC, including the County of Kill, in order to falsely make it appear the client killed the mule deer outside the MDCA in violation of Neb. Rev. Stat. 37-314, 37-411, 37-447, and NGPC Order C03.11H. J.H. and other HHO associates subsequently assisted and knew wildlife, or parts thereof, originating from these unlawful hunts was transported in interstate commerce.

16. That in furtherance of the conspiracy, J.H. and other unindicted co-conspirators, which included other HHO employees and associates, provided guiding and outfitting services for spring turkey hunts from at least 2014 through 2018, and that J.H. and other unindicted co-conspirators, which included HHO guides at the direction of J.H., authorized, directed, and assisted hunting clients taking at least 12 turkeys in excess of the established bag limit, at least five (5) turkeys from the road or roadway, and at least nine (9) turkeys with a rifle all as prohibited by Neb. Rev. Stat. 37-314, 37-457, 37-513(1), and NAC Title 163 Section 4.002.01A3. J.H. and other HHO associates subsequently assisted and knew wildlife, or parts thereof, originating from these unlawful hunts was transported in interstate commerce.

17. That between April 3, 2012, and April 2, 2017, while subject to the special conditions of supervision pursuant to J.H.'s April 3, 2012, sentencing for Lacey Act violations in the District of Nebraska, J.H. regularly carried or possessed firearms, including various suppressed rifles, bolt-action rifles, and semi-automatic rifles within J.H.'s vehicle and upon J.H.'s person while conducting HHO operations; and that J.H. personally utilized the firearms to unlawfully kill clients' big game animals or provided the firearms to the clients for the unlawful taking of big game animals or other wildlife subsequently transported in interstate commerce.

18. That in furtherance of the conspiracy, between September 15, 2012, and April 18, 2018, J.H. and other unindicted co-conspirators, which included other HHO employees and associates, offered, provided, directed, or otherwise aided or assisted contracted HHO hunting clients in unlawfully taking no less than 97 big game animals or wild turkeys in violation of Nebraska State Law including 30 white-tailed deer, 34 mule deer, six (6) pronghorn, and 27 wild turkeys by at least the following unlawful means or methods: taking white-tailed deer within baited areas in violation of Neb. Rev. Stat. 37-314 and NAC Title 163 Section 4.001.01B9; taking mule deer, white-tailed deer, pronghorn, and wild turkey with rifles or other prohibited weapons under the authority of archery, muzzleloader, or shotgun permits in violation of Neb. Rev. Stat. 37-314, 37-447, 37-457, and NAC

Title 163 Section 4.002.01A3, 4.003.01B, and 4.003.01C; taking mule deer and white-tailed deer during night-time or closed season hours and with the aid of artificial light in violation of Neb. Rev. Stat. 37-447 and 37-514(1); taking mule deer, white-tailed deer, and wild turkeys from the road in violation of Neb. Rev. Stat. 37-513(1); taking mule deer within the Mule Deer Conservation Area without a valid permit in violation of Neb. Rev. Stat. 37-314, 37-411, 37-447, and NGPC Order C03.11H; and taking white-tailed deer, mule deer, or wild turkeys without a valid permit or in excess of the bag limit in violation of Neb. Rev. Stat. 37-314, 37-411, 37-447, and 37-457. J.H. and other HHO associates subsequently assisted and knew wildlife, or parts thereof, originating from these unlawful hunts was transported in interstate commerce.

19. That in furtherance of the conspiracy, J.H. and other unindicted co-conspirators, operated HHO in a manner in which J.H. and other HHO guides, owners, or associates knowingly and intentionally provided hunting and guiding services for the unlawful taking of at least 97 white-tailed deer, mule deer, pronghorn, and wild turkey, of which the wildlife, or parts thereof, was purchased, acquired, or transported in interstate commerce, all in violation of 18 U.S.C. § 371, 16 U.S.C. § 3372(a)(2)(A), and 16 U.S.C. § 3373(d)(1)(B).

20. From at least September, 2013, through November, 2017, J.H. and other unindicted co-conspirators, which included other HHO employees and associates, routinely killed non-game migratory birds with a rifle, including various native species of hawks or falcons such as red-tailed hawks and American kestrels, that J.H. and HHO associates referred to the targeted non-game birds as "Dinosaurs," and that J.H. personally killed no less than 100 hawks, falcons, or other protected non-game migratory birds without authorization by shooting the birds while perched upon fence lines or electrical power lines between 2012 and 2017.

## III
## PENALTIES

A. Defendant understands that the crime to which defendant is pleading guilty carries the following penalties:

1. A maximum of 5 years of probation;
2. A maximum $500,000 fine;
3. A mandatory special assessment of $400.

## IV
## AGREEMENT LIMITED TO U.S. ATTORNEY'S OFFICE
## DISTRICT OF NEBRASKA

This plea agreement is limited to the United States Attorney's Office for the District of Nebraska, and cannot bind any other federal, state or local prosecuting, administrative, or regulatory authorities.

## V
## SENTENCING ISSUES

A. SENTENCING AGREEMENTS.

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties agree to the following:

   a. The Court, in its discretion, may impose a fine upon HIDDEN HILLS OUTFITTERS LLC.
   b. HIDDEN HILLS OUTFITTERS LLC be placed on a term of probation for a period of 5 years.
   c. HIDDEN HILLS OUTFITTERS LLC shall not provide hunting, trapping, guiding, outfitting, or otherwise engage in any activities associated with the hunting, trapping, guiding, or outfitting business for fifteen (15) years.
   d. HIDDEN HILLS OUTFITTERS LLC shall not manufacture, sell, distribute, market, or otherwise associate with those activities related to PrimeTine, Hard Rack Candy, or any other deer or wildlife bait, feed during the period of probation.
   e. HIDDEN HILLS OUTFITTERS LLC agrees to $214,375 in restitution, joint and several.

9

The Defendant acknowledges restitution will be ordered as a part of the sentence in this case, and the Defendant agrees the Court may order restitution to all persons or organizations for loss or harm directly and proximately caused by the Defendant's relevant conduct regardless whether that person or organization is a victim of the offense of conviction. As such, it is understood the Defendant will be ordered to pay restitution to the following persons or organizations:

1. Nebraska Game and Parks Commission Game Law Investigative Fund

The Defendant understands that a schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on methods, available to the United States to enforce the judgment. If incarcerated, the Defendant agrees to participate in the Bureau of Prisons Inmate Financial Responsibility Program, regardless whether the Court specifically directs participation or imposes a payment schedule. Pursuant to 18 U.S.C. § 3613, whatever monetary penalties are imposed by the Court will be due immediately and subject to immediate enforcement by the United States as provided for in Section 3613. The Defendant agrees to provide all of Defendant's financial information to the United States and the Probation Officer, and agrees, if requested, to participate in a pre-sentencing debtor exam.

C. "FACTUAL BASIS" AND "RELEVANT CONDUCT" INFORMATION.

The parties agree that the facts in the "factual basis" paragraph of this agreement, if any, are true, and may be considered as "relevant conduct" under U.S.S.G. § 1B1.3 and as the nature and circumstances of the offense under 18 U.S.C. § 3553(a)(1).

The parties agree that all information known by the office of United States Pretrial Service may be used by the Probation Office in submitting its presentence report, and may be disclosed to the court for purposes of sentencing.

## VI

### DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK

The defendant hereby knowingly and expressly waives any and all rights to appeal the defendant's conviction and sentence, including any restitution order in this case, and including a waiver of all motions, defenses, and objections which the defendant could assert to the charges or to the Court's entry of Judgment against the defendant, and including review pursuant to 18 U.S.C. § 3742 of any sentence imposed, except:

(a) As provided in Section I above, (if this is a conditional guilty plea); and

(b) A claim of ineffective assistance of counsel.

The defendant further knowingly and expressly waives any and all rights to contest the defendant's conviction and sentence in any post-conviction proceedings, including any proceedings under 28 U.S.C. § 2255, except:

(a) The right to timely challenge the defendant's conviction and the sentence of the Court should the Eighth Circuit Court of Appeals or the United States Supreme Court later find that the charge to which the defendant is agreeing to plead guilty fails to state a crime.

(b) The right to seek post-conviction relief based on ineffective assistance of counsel.

If defendant breaches this plea agreement, at any time, in any way, including, but not limited to, appealing or collaterally attacking the conviction or sentence, the United States may prosecute defendant for any counts, including those with mandatory minimum sentences, dismissed or not charged pursuant to this plea agreement. Additionally, the United States may use any factual admissions made by defendant pursuant to this plea agreement in any such prosecution.

## VII

## BREACH OF AGREEMENT

Should it be concluded by the United States that the defendant has committed a crime subsequent to signing the plea agreement, or otherwise violated this plea agreement, the defendant shall then be subject to prosecution for any federal, state, or local crime(s) which this agreement otherwise anticipated would be dismissed or not prosecuted. Any such prosecution(s) may be premised upon any information, statement, or testimony provided by the defendant.

In the event the defendant commits a crime or otherwise violates any term or condition of this plea agreement, the defendant shall not, because of such violation of this agreement, be allowed to withdraw the defendant's plea of guilty, and the United States will be relieved of any obligation it otherwise has under this agreement, and may withdraw any motions for dismissal of charges or for sentence relief it had already filed.

## VIII

## SCOPE OF AGREEMENT

A. This plea agreement embodies the entire agreement between the parties and supersedes any other agreement, written or oral.

B. By signing this agreement, the defendant agrees that the time between the date the defendant signs this agreement and the date of the guilty plea will be excluded under the Speedy Trial Act. The defendant stipulates that such period of delay is necessary in order for the defendant to have opportunity to enter the anticipated plea of guilty, and that the ends of justice served by such period of delay outweigh the best interest of the defendant and the public in a speedy trial.

C. The United States may use against the defendant any disclosure(s) the defendant has made pursuant to this agreement in any civil proceeding. Nothing contained in this agreement shall in any manner limit the defendant's civil liability which may otherwise be found to exist, or in any manner limit or prevent the United States from pursuing any applicable civil remedy, including but not limited to remedies regarding asset forfeiture and/or taxation.

D. Pursuant to 18 U.S.C. § 3013, the defendant will pay to the Clerk of the District Court the mandatory special assessment of $100 for each felony count to which the defendant pleads guilty. The defendant will make this payment at or before the time of sentencing.

E. By signing this agreement, the defendant waives the right to withdraw the defendant's plea of guilty pursuant to Federal Rule of Criminal Procedure 11(d). The defendant may only withdraw the guilty plea in the event the court rejects the plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(5). Furthermore, defendant understands that if the court rejects the plea agreement, whether or not defendant withdraws the guilty plea, the United States is relieved of any obligation it had under the agreement and defendant shall be subject to prosecution for any federal, state, or local crime(s) which this agreement otherwise anticipated would be dismissed or not prosecuted.

F. This agreement may be withdrawn by the United States at any time prior to its being signed by all parties.

## IX

## **MODIFICATION OF AGREEMENT MUST BE IN WRITING**

No promises, agreements or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless in writing and signed by all parties.

## X
## DEFENDANT AND COUNSEL FULLY UNDERSTAND AGREEMENT

By signing this agreement, defendant certifies that an authorized representative has read it and has discussed the terms of this agreement with defense counsel and fully understands its meaning and effect.

UNITED STATES OF AMERICA
JOSEPH P. KELLY
United States Attorney

Date 7/13/2020

DONALD J. KLEINE
ASSISTANT U.S. ATTORNEY

Date 3-10-20

HIDDEN HILLS OUTFITTERS LLC
DEFENDANT
By: JACOB HUEFTLE, Member

Date 3.10.20

PAUL J. BRUNO
COUNSEL FOR DEFENDANT

13